Filed 10/15/13  P. v. Hall CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054107 |
| v. | (Super.Ct.No. BAF005572) |
| BLAIR CHRISTOPHER HALL, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed.

Patrick Morgan Ford for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and A. Natasha Cortina, Heather M. Clark, and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Blair Christopher Hall was charged with the first degree murder of his wife of 29 years, Cristi Hall. (Pen. Code, § 187, subd. (a).) After a jury deadlocked eight to four in favor of conviction and a mistrial was declared, a second jury found defendant guilty of the murder, and the trial court sentenced defendant to 25 years to life in prison. On this appeal, defendant essentially raises four claims of evidentiary error and further claims that the evidentiary errors were both individually and cumulatively prejudicial. We conclude that all of the challenged evidence was properly admitted, and affirm the judgment.

Defendant has petitioned for a writ of habeas corpus in case No. E056812. We ordered the writ petition considered with this appeal. By separate order, we summarily deny the writ petition.

## I. BACKGROUND

The prosecution claimed that, shortly after 6:30 a.m. on June 7, 2007, defendant forcibly drowned his wife Cristi in the family's backyard spa. The defense claimed that Cristi accidentally drowned after hitting her head on the edge of the spa.

A. *Prosecution's Case-in-chief*

On June 7, 2007, Lindsay Patterson was on leave from the Navy and staying with her mother, Sharon Lopez, in Lopez's house in Calimesa. The backyard of Lopez's house abutted the backyard of the house where defendant, his wife Cristi, and their eldest daughter Courtney lived. The yards were separated by a common wall. Before June 7,

2

neither Patterson nor Lopez had ever had any contact with the Halls. The Halls had lived in their house since 2004.

On June 7, defendant and Cristi were having their master and guest bathrooms remodeled and combined into one larger bathroom. The contractor had removed the showers and tubs, and on the morning of June 7 the Halls and Courtney were planning to bathe outside in the family spa. The contractor was scheduled to arrive around 6:45 a.m.

Cristi came to Courtney's room sometime between 6:00 a.m. and 6:15 a.m. to wake her. Cristi was in her bathing suit and told Courtney that she and defendant were on their way out to the spa. Cristi asked Courtney whether Courtney was going to join them in the spa, and Courtney said she would bathe at her grandparents' house later that day. Courtney stayed in bed until defendant later came by and roused her.

Patterson awoke at 6:00 a.m. After waking, she sat on her mother's back patio, drinking coffee and smoking a cigarette. After 5 to 10 minutes, she went inside and used the bathroom next to the front door of the house. The bathroom window was open and looked toward the street in front of the house. Through the bathroom window, Patterson heard an adult woman scream, and the scream sounded panicked.

The scream frightened Patterson. A minute later, she walked out of the bathroom and toward the front door. At that point, she saw Lopez on the back patio and did not open the front door but went to Lopez and asked her whether she heard the scream. Lopez said she heard the scream.

3

Lopez had been asleep in her bedroom at the back of her house, which looks out onto her backyard. Her bedroom door was open. Around 6:30 a.m., Lopez was awakened by a loud scream or screaming. She immediately got out of bed and walked down the hallway that led out to her patio. The sliding glass door to the patio was open, and she walked out onto the patio. After a couple of seconds, she heard some splashing, thumping, and loud grunting sounds coming from the Hall residence. The sounds stopped just before Patterson came to the sliding glass door.

Lopez told Patterson that she heard the scream, and thought that kids were playing in the Halls' pool. Lopez then went inside her house for some coffee and noted that the atomic clock on her mantel read 6:32 a.m. After discussing with Lopez where the scream came from, Patterson walked onto the patio and listened, because she was still curious about where the scream came from.

After listening for a minute or so, Patterson walked over to the wall separating the Lopez and Hall yards because she heard a "gurgling sound," as if someone had swallowed too much water. She looked over (or through) the wall and clearly saw the spa area in the Halls' backyard. She saw defendant in the spa, leaning over and holding Cristi's face down in the water, with his right hand on her head and his left hand on her back. Patterson saw the right side of defendant's body as he was leaning over Cristi. Patterson initially thought the couple might be engaged in a sex act because Cristi's head was bent down between defendant's legs.

4

After looking over the wall for around 30 seconds, Patterson walked back to the patio where Lopez was drinking coffee and told Lopez what she had seen. Lopez told her not to worry about it and it was probably nothing. About 90 seconds after she left the wall, Patterson went back to the wall and looked into the Halls' backyard a second time. This time, she saw defendant sitting alone in the spa, leaning back against the wall with his elbows on the brick and looking around. Patterson did not see Cristi. She went back to Lopez and told Lopez that she did not see the woman anymore. Patterson was concerned because she did not believe enough time had passed for Cristi to get out of the spa and walk inside the house. Lopez told Patterson to stop being nosy and not to worry about it.

Still concerned, Patterson went back to the wall and looked into the Halls' backyard a third time. This time, she saw defendant step out of the spa and dry off with a towel as he walked around in a hurried manner. He put on some slip-on shoes, and looked toward the spa as he walked toward the wall where Patterson was looking toward him. Defendant looked angry and "as if he was in his own world and disconnected from anything."

When defendant walked towards her, Patterson loudly called out, "Sir? . . . Excuse me, sir?" a couple of times. Despite her calls, defendant did not look in Patterson's direction. Patterson watched defendant walk to his house, stop at the mat at the back door, and continue to dry himself with a towel.

5

Patterson had a "gut feeling" something was wrong. She again went back to Lopez and told her to call 911. Lopez ran inside, grabbed the telephone, and called 911. Lopez brought the telephone to Patterson, on the patio, and Patterson spoke with the 911 operator. During the call, Patterson relayed to the operator "in real time" some things she heard coming from the Halls' yard, such as a man yelling, "[t]ake her out."

Courtney was looking at her alarm clock at 6:37 a.m. when defendant came to her room, knocked on the wall, and told her to get up because the contractors would soon be there. Around 30 seconds after he left her room, Courtney heard defendant scream. She ran to the back sliding glass doors and saw defendant sitting on the concrete ledge of the spa with his feet in the spa and his arms under Cristi's armpits, pulling her out. Defendant told Courtney to "[c]all 911. Hurry," and Courtney did so. While on the telephone with the 911 operator, Courtney helped defendant pull Cristi out of the spa. Defendant was wearing shoes when he got out of the spa.

After helping defendant pull Cristi out of the spa, Courtney ran through the house, threw her telephone on the living room sofa, opened the front door, ran outside to open the front gate, and ran back through the house to the spa. When she got back to the spa, defendant was kneeling over Cristi but had not performed cardiopulmonary resuscitation (CPR). Courtney began chest compressions while defendant gave breaths. At this point, Cristi was blue, her eyes were dark, and there were no signs that she was still alive.

Courtney called 911 a second time because it seemed like it was taking a long time for responders to arrive. She used her mother's cell phone which was lying on the ledge

6

of the spa.  It was her parents' general practice to bring a cell phone with them when they used the spa.  Courtney was outside and still on the telephone with 911 when the first responders arrived.

At 6:46 a.m., Eric Norwood, a firefighter and emergency medical technician (EMT), and his captain were the first responders to arrive at the Hall house.  Norwood and his captain each administered CPR to Cristi.  They also moved her body a couple of feet to a dry area so they could use defibrillator pads.  They were not able to get any vital signs.

Marc Woodward, a paramedic with American Medical Response, arrived at the Hall house at 6:48 a.m.  He found Cristi cool to the touch, with no pulse or heartbeat.  The fire department continued CPR while Woodward created an advanced airway for Cristi by intubating her.  Woodward also inserted an I.V. on the top of Cristi's right hand.  Cristi was placed on a backboard on the ground, lifted to the stretcher, and taken to the ambulance.  She was not dropped, and no injury occurred to her body while Woodward was present.  Nor did any bruising likely occur to Cristi's mouth as a result of the intubation.

Photographs of defendant taken on June 7, 2007, showed injuries to his right bicep, chest, right leg, left foot, right foot, and on the toes of both of his feet.  Defendant's DNA matched DNA in fingernail clippings taken from Cristi.  A white metal earring and a hair clip with a large clump of hair were found at the bottom of the spa.

Courtney looked after many of the family's financial responsibilities after Cristi's death. Only a couple of weeks after Cristi's death, Courtney discussed disconnect notices and late notices on bills with defendant. In 2004, defendant and Cristi took out life insurance policies; the value of defendant's policy was $1 million and the value of Cristi's was $750,000. Following his arrest in this case, defendant relinquished his rights as the primary beneficiary of Cristi's policy, and the proceeds of the policy were paid to his and Cristi's three daughters, Courtney, Briana, and Ashtin.

The prosecution presented the testimony of two experts, Andrea Zaferes and Dr. Mark McCormick, who opined that Cristi's drowning was not an accident but a homicide. Zaferes testified first, followed by Dr. McCormick.

1. Andrea Zaferes's Testimony

For seven years before trial, Andrea Zaferes had worked as a "medical legal death investigator" for the Dutchess County Medical Examiner's office in New York. Zaferes testified as an expert on drowning deaths, and opined that Cristi's death was not an accidental drowning.

According to Zaferes, the Association of Pool and Spa Professionals estimated that there are six to seven million spas and hot tubs in the United States, and the Consumer Safety Product Commission reported 15 cases of people who slipped, fell, and drowned in a spa or hot tub between 2003 and 2007. Of those 15 drowning cases, only three involved an adult hitting their head and drowning. Zaferes also opined that head injuries in drowning cases typically occur to the front of the head, and the biggest risk factors for

8

spa-related drowning are intoxication, cardiac and seizure conditions, and age (i.e., toddlers and the elderly).

Zaferes went to the Hall home and got into the spa. Mimicking an unconscious person under water, she let herself go limp and exhaled the air from her lungs. She did this several times and sank to the bottom each time. She opined that if a person drowned in the spa, their head and entire body would be on the bottom of the spa.

Zaferes examined defendant's injuries, and opined that the injuries on his right foot and chest did not occur when he performed CPR on Cristi. Zaferes had given CPR and had seen CPR performed hundreds of times by people who were barefoot and working on gravel, sand, docks, cement, pool decks, and other types of environments, and had never seen a foot or chest injury like defendant's occur as a result of performing CPR.

Zaferes also examined Cristi's injuries. Visual inspection revealed the presence of petechial hemorrhages, which Zaferes explained are little spots visible on the skin due to capillaries rupturing from pressure. Zaferes noted that the presence of petechia is extremely rare in drowning cases, and their presence suggests the drowning death was not accidental. She had never seen a drowning victim with as much petechia as on Cristi's body. She also opined that the two injuries on Cristi's head could not have come from a single blow.

There was a bruise on only one side of Cristi's nose, and Zaferes had never seen a similar contusion result from squeezing a person's nose during CPR. A large clump of

9

Cristi's hair was found in the hair clip at the bottom of the spa. Zaferes had seen people removed from pools hundreds of times and had read hundreds of articles and police reports, but had never seen or heard of a clump of hair torn from a person's head during the removal process. Lastly, people who are in the process of drowning cannot scream, but may make "gurgling noises."

2. Dr. McCormick's Autopsy, Findings, and Opinion

On June 8, 2007, Dr. Mark McCormick, a forensic pathologist for the Riverside County Sheriff-Coroner's office, performed the autopsy on Cristi's body. The coroner investigates homicides, suicides, accidental deaths, and natural deaths not under the care of a physician. In Riverside County, forensic pathologists are responsible for determining the cause of death (e.g., drowning) and deputy coroners are responsible for determining the manner of death (e.g., homicide or accident).

On his initial inspection, Dr. McCormick noticed smeared blood on parts of Cristi's body, and medical equipment, including an endotracheal tube in Cristi's mouth, electrocardiogram and defibrillator pads on her torso, and intravenous catheters in her body. The sheriff-coroner's office requests that life-saving medical equipment be left on the body so that they may distinguish between injuries that occurred before death and those that occurred as a result of life-saving measures.

During his external examination of the body, Dr. McCormick noted a three-inch-long laceration on the left side of the scalp, one-quarter to three-quarters of an inch deep, and extending down to the underlying bone. There was a smaller laceration toward the

10

back of the head, also on the left side.  Dr. McCormick opined that the two lacerations resulted from at least two separate blows or blunt force impacts to Cristi's head.

The larger laceration could have been caused by falling from a standing height onto concrete, or by the head being driven into the side of a cement Jacuzzi with the force of a 250-pound man.  The smaller laceration could not have been caused by the head dropping to the ground if the head was up at an angle and the back was resting on the ground.

There were also injuries to Cristi's mouth and chin, including an abrasion on the inside of the left side of her lower lip, a small bruise on the inside of the lip, abrasions on both sides of the tongue near the top of the tongue, a bruise on the left side within the muscle of the tongue, and an abrasion under the chin.  Dr. McCormick opined that these injuries were more consistent with someone engaged in a struggle than an accidental injury or intubation injuries.  In addition, the injuries to the mouth showed at least two more areas of impact, and there were too many points of impact to be explained by a slip and fall.

Dr. McCormick also noted the presence of numerous petechial hemorrhages on and in Cristi's body.  Petechial hemorrhages are small pinpoint hemorrhages that occur when pressure in the capillaries in the skin become too great, causing the capillaries to rupture.  They are most common in the tissues of the head, especially the eyes, and are a "very rare finding" in accidental adult drowning deaths.  Cristi had petechial

11

hemorrhages on her cheeks, nose, the white parts of her eyes, the tissue surrounding her eyes, the inside of her mouth, and on her upper arms and chest.

Based on the totality of Cristi's injuries and his findings, Dr. McCormick concluded that the cause of Cristi's death was drowning, but the drowning was not accidental. The existence of the petechial hemorrhages alone was insufficient to support his conclusion that the drowning was not accidental, but "certainly ma[d]e [him] suspicious" that it was not accidental. The injuries on Cristi's body, together with the number and intensity of the petechial hemorrhages, was "very important" to his conclusion.

Dr. McCormick explained that, although lividity, which is the pooling of blood under the influence of gravity, can cause petechial hemorrhages, those on Cristi's body were not caused by lividity because the lividity in her body was posterior, or in the back, and was not present in her face. In addition, although there is some disagreement in the medical literature concerning whether CPR can cause petechial hemorrhages, Dr. McCormick was not convinced that CPR causes petechial hemorrhages because, in his review of the cases offered as evidence, the people died of things that could themselves have caused petechial hemorrhages. Furthermore, in his experience of performing around a dozen autopsies per week where more than half of the people received CPR, he rarely saw petechial hemorrhages and had never seen petechial hemorrhages in someone that did not have another reason to have them. Nor had he ever seen them in any of his drowning cases, and in those cases half or more of the people had received CPR.

12

B. *Defense Case*

The defense claimed Cristi slipped, fell, hit her head, and accidentally drowned in the spa after defendant went back inside the house to use the restroom. The defense also presented evidence that defendant had no motive to murder Cristi because the two of them were happy and their marital and financial problems were behind them.

1. Lack of Motive Evidence

Defendant's daughters, Courtney, Briana, and Ashtin, and two of Cristi's five siblings, testified that defendant and Cristi had "a very good marriage," got along well, and were very loving and passionate toward each other. Defendant and Cristi had a financially comfortable lifestyle during the last year of Cristi's life, and Cristi was happy the week before her death. During the week before she died, Cristi talked to Briana about "this being one of the happiest times of her life."

2. Defendant's Direct Testimony

Defendant testified that when he and Cristi met in 1978 he was in the Air Force working as a law enforcement specialist. They married in 1978 and had three daughters, Courtney, Briana, and Ashtin, in 1984, 1986, and 1988. Defendant and Cristi generally enjoyed a healthy marital life, and the last two years of Cristi's life were probably the best years of the couple's marriage. At the time of trial, defendant still had a good relationship with Cristi's parents, and he was still close to Cristi's sister Kathy and his brother-in-law Chuck.

13

In 1994, defendant retired from the San Bernardino Police Department and thereafter moved with his family to Cascade, Idaho, where he worked for the Cascade Police Department for three years. He then became the chief of police for the City of Emmet, Idaho, where he was ultimately convicted of misusing public funds for personal use, a felony. He pled guilty and served 10 months in jail during 2000. Upon his release, his law enforcement career was over.

Before defendant's conviction in the Idaho case, Cristi and the girls moved back to California. Before defendant went to jail, Cristi began training to become an X-ray technician. She continued training during 2000 and 2001, completed her training, and began working for the County of San Bernardino at Arrowhead Regional Medical Center. Defendant and Cristi remained close while defendant was in jail.

When defendant was released from jail at the end of 2000, the family finances were "[r]ough, at best." When defendant returned home, he worked a short time in the auto/boat sales business. During 2001 or 2002, he opened his own business performing criminal background checks for companies on their prospective employees. His business grew between 2003 and 2005, and by 2005 the family standard of living was better than ever. The family's gross income in 2004 or 2005 was $295,000. In 2004 or 2005, Courtney went to college, followed later by Briana, then Ashtin. Defendant and Cristi helped each girl pay for college.

Defendant testified on direct that 2007 was the family's best year financially. But on cross-examination, he could not recall the amount of his after-tax income or the

14

amount of income he declared on his income tax returns for 2007. He also admitted that he and Cristi may have had as little as $50,000 in net income during 2007.

On June 7, 2007, defendant got up around 4:30 a.m. or 5:00 a.m. to turn on the spa to get it warm so they could bathe in it because they did not have a working shower that day. He went back to bed, got up again around 5:30 a.m., and called Briana, who was away at college, to wake her so she could go running. Cristi also got up around 5:30 a.m., put on her bathing suit, and got ready to get into the spa. On their way out to the spa, Cristi tried to wake Courtney, but Courtney did not go to the spa with them.

Defendant and Cristi stayed in the spa together for around 45 minutes. Cristi bathed and put her face into the spa water. After bathing, Cristi got out of the spa to get another cup of coffee and use the restroom while defendant sat in the spa alone for another five minutes. Defendant then got out of the spa and walked a few steps around the pool to look at some soap bubbles that had seeped into the pool from the spa. He then went inside the house to use the restroom and was in there for five minutes or so. It takes 15 to 20 seconds to walk from the spa to the home. As he walked out of the restroom, the door to Courtney's room was ajar and he pushed it open, hit the wall, and told Courtney to get up.

Defendant then walked out to the backyard again. He did not know anything was wrong until he walked up to the pool deck and saw Cristi floating face down in the spa. He jumped into the spa with his shoes on, put his arms under Cristi's armpits, tried to pull her out of the water, and yelled for Courtney. It was difficult for him to lift Cristi out of

15

the water by himself because she weighed nearly 200 pounds. Courtney helped him pull Cristi out of the spa, and they laid her on the pool deck. He gave breaths to Cristi while Courtney performed chest compressions. Although his shoes were on when he pulled Cristi out of the spa, he believed he was barefoot when he administered CPR.

3. Defendant's Testimony Under Cross-examination

On cross-examination, defendant admitted that in light of Courtney's testimony that Cristi came to her room between 6:00 a.m. and 6:10 a.m., he and Cristi could have gone to the spa between 6:00 a.m. and 6:10 a.m., not 5:30 a.m., and could not have been in the spa together for a half an hour, let alone 45 minutes as he testified.

Defendant claimed that after Cristi finished washing herself in the spa, she went into the house to get more coffee, use the restroom, and wake Courtney. He passed Cristi in the doorway as he was going inside after using the spa, Cristi was coming back outside, and Cristi told him she tried to wake Courtney. Although he believed Cristi was going back to the spa after they passed each other in the doorway, he did not ask her why she was going back to the spa after she had already washed herself and the spa water was now dirty.

When he passed Cristi on his way back to the spa, defendant was going into the house to use the bathroom. While in the bathroom, that looks out to the spa area, he never heard any splashing, did not hear anyone scream, and did not hear any other sounds coming from the spa area.

16

When asked whether he did anything that might look as though he was holding Cristi under water, defendant said that Cristi "may" have been washing her face by dunking it into the spa. But during the police interview, he never provided this explanation to the detectives, despite being asked to explain why it would look like his wife's face was under water. During the police interview, he never mentioned that Cristi's face was in the water at any time.

Defendant did not use the cell phone by the spa to call 911, but called Courtney out to the yard to call 911. He did not recall whether he began giving Cristi CPR right after he and Courtney got Cristi out of the spa, but he admitted he performed no chest compressions even after Courtney left the spa area to open the front door and gate for the first responders. He did not have any injuries on his feet before June 7, and claimed he must have incurred the injuries when he was giving breaths to Cristi.

4. Dan Witte's Testimony

Dan Witte testified that, in May 2007, he contracted with defendant and Cristi to remodel their bathrooms into one large bathroom. On June 7, Witte was scheduled to arrive at the Hall house around 7:00 a.m. to begin work for the day. At that time, he had been working on the Hall house for around two weeks, and defendant and Cristi seemed to get along well. They did not argue and readily agreed about questions concerning the remodel. Witte admitted that, before June 7, defendant gave him a check for $5,000, but before Witte attempted to deposit the check he discovered that the bank account on which it was drawn had insufficient funds to cover it, and he was never paid for any of his work.

17

5.  Expert Testimony Regarding the Source of the Scream

Two of the Halls' neighbors testified they did not hear a woman scream on the morning of June 7, 2007.

Genevieve Heckman, Ph.D., a human factors expert, concluded that the source of the scream Patterson and Lopez heard did not come from Cristi, and that Patterson could not have seen defendant holding Cristi under water.  Dr. Heckman generally testified that people can misidentify sound if the context in which it is heard is misleading; memories can be distorted by recalling an event multiple times; distance affects ability to perceive facial expressions; people tend to overestimate the duration of events they experience; and distance affects depth perception.

Dr. Heckman performed a vantage point study at the Hall residence to demonstrate the principle that the larger the distance from point A to point B, the larger the compression of depth to the observer.  Dr. Heckman took two sets of pictures of her assistant posing in the spa with a mannequin.  The first set of pictures was taken from the wall separating the Hall and Lopez houses and showed the person and the mannequin in the spa, positioned in three different distances from one another.  The second set of pictures was taken from a closer vantage point and showed that when the figures appeared to be touching from the farther vantage point, they actually were not.  Dr. Heckman admitted that the two sets of pictures were not taken at the two vantage points simultaneously, thus permitting the mannequin to shift or drift while she walked from one vantage point to another.

18

6. <u>Dr. Frank Sheridan's Expert Testimony That Cristi Accidentally Drowned</u>

Dr. Frank E. Sheridan, a forensic pathologist and the chief medical examiner in the coroner's division of the San Bernardino County Sheriff's Department, testified for the defense that Cristi's death was consistent with an accidental drowning, but he could not rule out the possibility that the death was a homicide.

During the course of his career, Dr. Sheridan had performed many autopsies on drowning victims, and had rendered opinions that certain drownings were accidental and others were homicides. He reviewed the autopsy report prepared by Dr. McCormick, photographs taken of Cristi at the hospital and during the autopsy, police reports, witness statements, and prior testimony in the case. He also went to the Hall home and observed the spa, and observed that it was "a very dangerous spa." The spa had no handrails and stairs leading down into it, raising the possibility of falling, and there was a larger distance down to the second step than to the first step. In addition, one of the corners of the spa protruded toward the center and was opposite to the stairs leading down into the spa.

Dr. Sheridan agreed with Dr. McCormick that the cause of Cristi's death was drowning, but opined that the severity of the larger laceration to her head was consistent with the force involved in a fall from a standing position, or with her falling and hitting her head on any edge of the spa. The injury "[a]lmost certainly" would have rendered Cristi unconscious. The injuries to Cristi's mouth, torso, and ribs also could have been caused by a fall, taking her out of the spa, or efforts to resuscitate her. Dr. Sheridan

19

admitted, however, that the two lacerations to Cristi's head were not caused by the same impact.

Dr. Sheridan believed that the petechia in Cristi's body was caused when she died face down and tilted with her head lower than her feet and toward the bottom of the spa. Given the configuration of the spa, he opined that if Cristi fell, then her feet would have been held up by the seating tiers and her head would have been lower than her feet. He was not aware that defendant testified he found Cristi with her head floating close to the surface of the water.

C. *Prosecution Rebuttal*

### 1. Dr. Craig Nelson's Expert Rebuttal Testimony

Dr. Craig Nelson, a forensic pathologist and the deputy medical examiner for San Diego County, examined the autopsy report, coroner's investigation, photographs taken at the scene, hospital, and autopsy, and other evidence in the case, and concluded that the cause and manner of Cristi's death was drowning by homicide. Like Dr. McCormick, Dr. Nelson believed there were too many injuries in different locations on Cristi's body to be consistent with a slip and fall and subsequent drowning. The two lacerations on Cristi's head were not caused by a single fall, and the larger one was consistent with someone taking her head and slamming it into the side of the spa. Further, petechial hemorrhages are not normally present in accidental drownings, and the number of petechial hemorrhages on Cristi far exceeded what would be expected from resuscitation efforts.

20

2. The Police Officers' Rebuttal Testimony (Defendant Not Honest)

Raymond Chopko, a police detective in Idaho, met defendant in Cascade, Idaho in 1996, considered himself a friend of defendant's, and got to know defendant fairly well between 1996 and 2000. They worked together in law enforcement for nearly two years, their daughters attended the same school, and their families socialized with each other, including on weekends. Based on his professional and personal experiences with defendant, Detective Chopko opined that defendant was "probably the biggest con man I've ever met in my life." On cross-examination, Detective Chopko admitted he had not spoken with defendant since 1998.

Jerald Winkle worked for the Los Angeles Police Department for 23 years and retired as a lieutenant. He met defendant in Idaho when he and other police officers, including Detective Chopko and ex-police officers like himself, met to play cards and have dinner. Winkle was a friend of defendant and his family when they lived in Idaho, around 15 years before trial. Based on his relationship with defendant, Winkle opined that defendant was "not honest," and he was ashamed "to bring up the fact that [defendant] was [or had been] a police officer." Like Detective Chopko, Winkle had not spoken to defendant since 1998, when defendant left Idaho.

3. Rebuttal Testimony of Cristi's Friends and Coworkers

Cynthia Rojas was one of Cristi's coworkers and friends. Rojas had known Cristi for about a year before her death and took breaks with her at work. When Rojas first met Cristi, she was "happy, bubbly," and "outgoing," and would say "good morning" to

21

everyone. About three weeks before Cristi's death, Rojas noticed a "big difference" in Cristi's personality; she became "very quiet. She looked sad" and "anxious," and was "moody." Rojas had not seen Cristi act moody prior to the three weeks before her death.

Leticia Valenzuela was also friends with Cristi at work and knew her for about three years before her death. During the week before Cristi's death, Valenzuela noticed a significant change in Cristi's personality. Cristi became very serious, appeared to have a lot on her mind, and stopped greeting people when she arrived at work. Contrary to her normal disposition, she did not appear happy and seemed upset at something. Normally, Cristi would greet everyone and was friendly.

Taffy McDowell was also Cristi's friend and coworker. They took their breaks and lunches together. When McDowell first met Cristi, Cristi was happy-go-lucky, cheerful, outgoing, caring, and kind. One time when she had lunch with Cristi, McDowell complimented Cristi on her family and her relationship with her husband. In response, Cristi "said at one point in time [Cristi did not say when] it had got that bad where they were contemplating divorce." McDowell also noticed a big change in Cristi a week or two before her death; she was introverted, was "distant" to everyone, and seldom came out of her office. McDowell said "it looked like the life had been sucked out of her[.]"

Julie Dietel was "best friends" with Cristi and had known her since 1999. When they first met, Cristi was always in a good mood and could make anyone laugh, and have a good time. Between 2006 and 2007, Dietel spoke with Cristi on the telephone almost

22

every day.  About six months before Cristi's death, Dietel noticed that Cristi's personality changed; she was unhappy and in a bad mood.  Dietel asked Cristi what was wrong, and Cristi told her she was mad at their boss.  Dietel did not believe that what was affecting Cristi was work-related, however.  On cross-examination, Dietel said she believed Cristi's marriage to defendant was "great" up until the time Cristi died; they appeared to love each other.

### III.  DISCUSSION

A.  *Issues Concerning Andrea Zaferes's Expert Qualifications and Testimony*

Andrea Zaferes testified as an expert for the prosecution on water-related deaths, and opined that Cristi's drowning death was a homicide, not accidental.

Defendant essentially raises two claims concerning Zaferes's testimony.  He claims the court erroneously failed to conduct a hearing outside the presence of the jury and before Zaferes testified to determine whether Zaferes was qualified to testify as an expert on whether water-related deaths were homicides or accidents.  Second, he claims Zaferes was not qualified to render "an expert medical opinion" that Cristi's drowning death was nonaccidental because she was not a medical doctor.  Neither claim has merit.

1.  Relevant Background

(a)  *The Settled Statement Hearing*

On March 2, 2012, and at the request of appellate counsel, the court held a settled statement hearing to settle or determine the content of certain unreported, in-chambers discussions that were not later summarized on the record.  (Cal. Rules of Court, rule

23

8.137.) During the hearing, the court and parties agreed that, before Zaferes testified, defense counsel objected to her testimony on two grounds: (1) she was not qualified to testify as an expert on whether Cristi's drowning death was accidental or intentionally caused, and (2) whether a drowning death was accidental or intentionally caused is not a proper subject for expert opinion.

At the hearing, the court said: "I do believe the issue came up, which was, not only she, as an individual, wasn't qualified, and I believe what we said is, [w]ell, I'm going to have to hear her. And I couldn't make a decision and didn't make a decision in chambers. And I did hear her and made a decision she was qualified. [¶] And as for the issue that no person could opine such things, again, I said, I have to hear her. So I did hear her, and I did permit her to give the opinions. So I don't know—if you just want the record to reflect that the issues were raised so there's no waiver on appeal, I have no problem with that." The prosecutor agreed that the defense had preserved the issues for appeal.

Defense counsel than added: "There were objections made that I had made during the testimony even though we had discussed in chambers that the defense would object to this. The thing is at the time that I made the objection, I didn't make a long record as we had already discussed at length the reasons why we thought the objections were valid. So I tried to preserve the issue as best I could by objecting at trial but didn't in front of the jury make a long record because of the conversations we had had in chambers, and I explained that to [appellate counsel]."

24

During the settled statement hearing, defense counsel at no time asserted that he asked the court to conduct a hearing, outside the presence of the jury and *before Zaferes testified*, to determine whether Zaferes was qualified to testify as an expert on any issue. To the contrary, based on defense counsel's comments during the settled statement hearing, it appears that he was satisfied to challenge Zaferes's expert qualifications, or take her on voir dire, when she testified before the jury.

### (b) *Zaferes' Qualifications*

At trial, the prosecutor called Zaferes as a witness and, before eliciting any expert opinions, examined her at length concerning her background, and qualifications. Zaferes was currently employed as a "medical legal death investigator for the Dutchess County Medical Examiner's office in New York," and had been for seven years. She had worked as an EMT for 19 years, and had a bachelor's degree in psychology. As an EMT, she administered CPR over 30 times and worked on cases involving head lacerations, mostly from car accidents, some falls, and a few assaults.

As a medical-legal death investigator, whenever there was a "reportable death" in Dutchess County, Zaferes was responsible for determining whether the medical examiner's office investigated the death to determine whether it was a homicide or suicide. Her duties included visiting the scene of the death to examine the body and the scene, reviewing witness statements, interviewing law enforcement and medical personnel, and writing a report. She had "worked over 600 deaths" and had been "on 150

25

to 160 death scenes." She also taught detectives how to interview witnesses "for specific water-related incidents."

Around 20 years before trial, Zaferes helped found, and continued to work with, an organization called "Riptide," that assisted law enforcement agencies and families in investigating water-related deaths and bodies found in water. For Riptide, she reviewed materials, asked questions, and helped determine whether the water-related deaths were homicides, suicides, or accidents.

She had worked on over 100 homicidal drowning investigations and had spent hundreds of hours on 30 to 40 of those cases. At any given time, she was working on two to three homicidal drowning cases. She regularly kept herself informed of the latest research and trends in the field of water rescues and homicidal drownings.

She also taught "water rescue" for a company called Lifeguard Systems; taught fire, police, military and U.S. Coast Guard personnel "how to find bodies and evidence in the water" and "how to process water-related scenes"; and worked pro bono as "the water consultant" for the National Center for Missing and Exploited Children.

Since 1987, she had taught "hundreds and hundreds of people" how to perform CPR in water-related conditions, including how to get a person out of a pool, ocean, or lake and onto a dock, boat, or beach, and perform CPR in those conditions. In addition, she taught "well over a thousand law enforcement and death investigators in a 24-hour or 16-hour program [she] created called Body Found in Water in Homicidal Drowning Investigations."

26

She was an associate member of the National American Medical Association, the International Association of County Coroners and Medical Examiners, the American Academy of Forensic Sciences, the New York State Coroners and Medical Examiners Association, the Water Safety Congress, and "a few other smaller water and forensic related" organizations. She had spoken "at over 77 aquatic and medical conferences," and "at over 33 forensic conferences for death investigators and law enforcement on the topic of how to investigate a water death."

(c) *Defense Counsel's Examination of Zaferes*

During the prosecution's direct examination of Zaferes, defense counsel at no time objected that Zaferes was not qualified to testify as an expert witness on any issue. (Evid. Code, §§ 720, 801.)[1] In cross-examining Zaferes, the defense questioned Zaferes's background and qualifications, including the number of times she had testified as an expert witness and her educational background.

The defense established that Zaferes had no advanced degrees. She had never attended medical school and was not a medical doctor, medical examiner, or coroner. Zaferes acknowledged that forensic pathologists are licensed medical doctors, and that forensic pathology is a branch of pathology concerned with determining the cause of death and the circumstances surrounding the death.

---

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

27

Zaferes agreed that, in California, only licensed forensic pathologists—that is, medical doctors concerned with determining the cause of deaths and the circumstances surrounding deaths—can be medical examiners.  The defense also established that Zaferes's work did not include performing autopsies or incisions, but Zaferes pointed out that she assisted with the autopsies and asked questions, and that the medical examiner consulted with her in water-related cases.  The following colloquy then ensued:

"[DEFENSE COUNSEL:]  In California to have the credential as a medical examiner, you must first be a licensed forensic pathologist.

"[ZAFERES:]  That's correct.

"[PROSECUTOR:]  I am going to object as irrelevant to this line of questioning.

"THE COURT:  Well, under [section] 352 we are going to move to a different subject, but nothing will be stricken.

"[DEFENSE COUNSEL:]  Your expertise does not include the medical examination of tissues under a microscope.

"THE COURT:  Counsel, we're moving on.  We've established this point.

"[DEFENSE COUNSEL:]  And, ultimately, it is the job of a forensic pathologist to make a determination . . . .

"THE COURT:  Counsel, we're making the same point over and over.  We're moving on.  [¶]  . . .  [¶]

"[DEFENSE COUNSEL:]  The determination of homicide versus accident, ultimately is that of a medical examiner; correct?

28

"[ZAFERES:]  Depending on the state.  Sometimes it's the coroner or deputy coroner."

2.  Analysis/Failure to Conduct Section 402 Hearing

Defendant first argues that the court was required to conduct a hearing, outside the presence of the jury and before Zaferes testified—apparently on the court's own motion and in the absence of defense counsel's request for such a hearing—to determine whether Zaferes was qualified to testify as an expert witness.  Defendant is mistaken.  The court had no such sua sponte obligation.

The record on appeal, including the matters discussed during the settled statement hearing on March 2, 2012, does not show that the defense ever asked the court to conduct a hearing outside the presence of the jury so that the defense could question or voir dire Zaferes concerning her qualifications to testify as an expert, and so that the court could expressly rule on whether she was qualified to testify before she testified.  Defendant cites no authority to support his claim that the court was required to conduct such a hearing on its own motion, in the absence of any request for such a hearing.

As defendant points out, a witness may not testify as an expert before his or her qualifications to testify as an expert have been "shown."  (§ 720, subd. (a) ["[a]gainst the objection of a party, [a witness's] special knowledge, skill, experience, training, or education *must be shown* before the witness may testify as an expert."  (Italics added.)].)  But this does not mean that an expert witness's qualifications *can only be shown* in a hearing conducted outside the presence of the jury and before the witness testifies.

29

To the contrary, the procedure followed here—direct examination by the prosecutor concerning the witness's qualifications before the witness renders any expert opinions—is proper and commonly followed. (See 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2009) Opinion Testimony From Expert and Lay Witnesses, § 30.19, p. 669 ["It is common for the proponent of expert opinion testimony to first ask the witness questions concerning the expert's qualifications to testify. This is commonly called 'voir diring' the expert. If there is no objection, the proponent continues with questions concerning the case."].)

Further, nothing in sections 400 to 406 or 720 requires the court to conduct a hearing outside the presence of the jury and before a witness testifies, to determine whether the witness is qualified to testify as an expert, in the absence of a request for such a hearing. To the contrary, section 402 states: "(a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. [¶] (b) The court *may hear* and determine the question of the admissibility of evidence out of the presence or hearing of the jury . . . ." (Italics added.) Nothing in section 405 is to the contrary.

In a similar vein, defendant complains that the court "failed to require a showing" of Zaferes's expert qualifications "as described by the statute." Not so. Zaferes's qualifications were "shown" during the prosecution's direct examination of her, before she rendered any expert opinions. (§ 720, subd. (a).)

Nor does the record support defendant's assertion that the court failed to find that Zaferes was qualified to testify as an expert. Whether a witness is sufficiently qualified to testify as an expert is a fact to be determined by the court, not the jury, before the witness may testify as an expert. (See *Fairbank v. Hughson* (1881) 58 Cal. 314, 315; §§ 310, 400-406,[2] 720, subd. (a).) As a general rule, the qualifications of a witness to testify as an expert is made by the court pursuant to section 405; *Martin v. Superior Court* (1991) 230 Cal.App.3d 1192, 1200.)[3]

After Zaferes testified on direct examination concerning her qualifications, the court implicitly found that she was qualified to testify as an expert before the court allowed her to render any expert opinions. During the settled statement hearing, the court recalled that the issue of Zaferes's qualifications "came up" during off-the-record discussions in chambers. The court explained: "I believe what we said is, [w]ell, I'm going to have to hear her. And I couldn't make a decision and didn't make a decision in chambers. And I did hear her and made a decision she was qualified." Given that the

---

[2] More generally, the court must determine issues of fact that are foundational or preliminary to the admission of other evidence pursuant to sections 400 to 406. (§ 310 ["Determination of issues of fact preliminary to the admission of evidence are to be decided by the court as provided in Article 2 (commencing with Section 400) of Chapter 4" of the Evidence Code].)

[3] See also 1 Jefferson, California Evidence Benchbook, *supra*, Opinion Testimony From Expert and Lay Witnesses, section 30.19, page 669 ("If there is a dispute about whether a witness is qualified as an expert witness to give opinion testimony, the judge must make a determination that the witness is so qualified before permitting him or her to testify.").

31

defense did not ask the court to rule on Zaferes's qualifications, there was no need for the court to make its finding explicit.

Lastly, we disagree that the court "further erred by restricting cross-examination of [Zaferes] regarding her medical expertise." Defendant points to the portion of defense counsel's cross-examination in which the court sustained its own section 352 objection to asking Zaferes whether, in California, a medical examiner had to be a licensed forensic pathologist, and whether her expertise included examining tissue under a microscope. That objection was properly sustained because counsel's questions were cumulative. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1385 [trial court has broad discretion to limit "marginally relevant and cumulative" questions].) Moments earlier, defense counsel asked Zaferes, and Zaferes acknowledged, that she was not a forensic pathologist, she did not perform autopsies, and the duty of a forensic pathologist was to determine the cause of death, and the manner or circumstances surrounding the death.

3. Analysis/Zaferes's Expert Qualifications and Opinion

Defendant claims that Zaferes was not qualified to "give a medical opinion" that Cristi's drowning was not accidental because she was not a medical examiner or forensic pathologist, and had no medical school training. We disagree.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (§ 720, subd. (a).) Expert opinion testimony is limited to a subject "that is sufficiently beyond common experience that the opinion of an expert

would assist the trier of fact . . . ." (§ 801, subd. (a).) "'The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.] That discretion is necessarily broad: "The competency of an expert 'is in every case a relative one, i.e., relative to the topic about which the person is asked to make his statement.' [Citation.]" [Citation.] Absent a manifest abuse, the court's determination will not be disturbed on appeal. [Citations.]' [Citation.]" (*People v. Casteneda* (2011) 51 Cal.4th 1292, 1336.)

Defendant argues that Zaferes was not qualified to opine that Cristi's drowning death was not accidental because she was not a medical examiner or forensic pathologist, and had no graduate or medical school training. However, formal education and professional degrees are not required to render an expert opinion. (*People v. King* (1968) 266 Cal.App.2d 437, 443.) Rather, "[t]he foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115.)

A sufficient foundational showing for Zaferes's opinion was made here. On direct examination, Zaferes testified at length concerning her background and experience in determining, and in helping others determine, whether water-related deaths are accidents, suicides, or homicides. Given the breadth and longevity of her experience in advising medical examiners, forensic pathologists, law enforcement personnel, and others

33

concerning how to investigate water-related deaths and determine whether they were accidents, suicides, or homicides, Zaferes was, as the People argue, "uniquely qualified" to render an opinion that Cristi's drowning death was not accidental. Whether Cristi's drowning death was an accident or homicide was not a "medical causation issue" which can only be determined by expert medical testimony. (*Salasguevara v. Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 384.)

Finally, defendant relies on several cases in which the courts concluded that an expert was not qualified to opine on a question that fell outside the area of the expert's special knowledge, skill, experience, training, or education.[4] The cases are inapposite because the question of whether Cristi's drowning death was accidental was a question falling well within the realm of Zaferes's training and experience.

---

[4] *People v. Hogan* (1982) 31 Cal.3d 815, 851 through 853 (criminalist not qualified to opine that the bloodstains were deposited by "spatters or wipes" where he lacked education, training, or experience in determining whether blood was deposited "by flying drops or by surface-to-surface contact"), footnote omitted; *People v. Williams* (1992) 3 Cal.App.4th 1326, 1330 and 1331, 1333 and 1334 (police officer trained in giving horizontal gaze nystagmus test not qualified to offer expert opinion that defendant was under the influence of alcohol based on results of nystagmus test where officer lacked training or experience in "the processes by which alcohol ingestion produces nystagmus"); *Salasguevara v. Wyeth Laboratories, Inc.*, *supra,* 222 Cal.App.3d at page 386 (plaintiff's treating physician not qualified to testify on whether vaccine caused plaintiff's injuries, where physician had no training, experience, or skill regarding effects of vaccine); *People v. Davenport* (1995) 11 Cal.4th 1171, 1207 (homicide investigator not qualified to opine whether victim impaled by stake before or after death, given his lack of medical training and limited understanding of manner in which cause and time of death are clinically determined).

B. *The Rebuttal Testimony of Cristi's Coworkers That Cristi Was Dejected*

Defendant next claims the court erroneously allowed the prosecutor to present the rebuttal testimony of Cristi's friends and coworkers that Cristi was dejected at work during the weeks before her death. He argues that the coworkers' testimony was irrelevant to rebut the defense claim that defendant and Cristi had a happy marriage, and were happy during the weeks preceding Cristi's death, because there was no showing that Cristi's dejectedness at work had anything to do with him.

Of course, only relevant evidence is admissible (§§ 210, 350), and all relevant evidence is admissible unless excluded under the federal or state Constitutions or by statute (*People v. Heard* (2003) 31 Cal.4th 946, 972-973). Relevant evidence is defined as "evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) The court has broad discretion in determining whether evidence is relevant, but lacks discretion to admit irrelevant evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 14.) We review the court's rulings on the admissibility of evidence for abuse of discretion. (*People v. Cowan* (2010) 50 Cal.4th 401, 482.)

The court did not abuse its discretion in admitting the coworkers' testimony. The testimony was relevant to rebut the defense claim that defendant and Cristi had a happy marriage and, more specifically, that Cristi was "the happiest she had ever been[.]" The defense not only claimed that defendant and Cristi had a happy marriage, it also claimed that, during the week before her death, Cristi told two of her daughters that she was "the

35

happiest she had ever been[.]"  Further, the defense claimed that Cristi was the happiest she had ever been precisely because she and defendant had such a happy marriage and were so happy together.  Thus, contrary to defendant's argument, the evidence that Cristi was dejected at work during the weeks before her death was relevant to rebut the defense claim that Cristi was happy, and that she and defendant were happy together.

Defendant also claims that the coworkers' testimony should have been excluded under section 352 because it was unduly prejudicial, or likely to evoke an emotional response against him.  Not so.  The court has discretion to exclude relevant evidence if its probative value is substantially outweighed by the probability its admission will result in "undue prejudice."  (§ 352; *People v. Zapien* (1993) 4 Cal.4th 929, 958.)  In this context, unduly prejudicial evidence is that which ""'uniquely tends to evoke an emotional bias against the defendant as an individual . . . .'""  (*People v. Alexander* (2010) 49 Cal.4th 846, 905.)  Nothing about the coworkers' testimony was likely to evoke an emotional bias against defendant.

C.  *The Rebuttal Testimony That Cristi and Defendant Once Contemplated Divorce*

One of Cristi's friends and coworkers, Taffy McDowell, testified in rebuttal that one time when she and Cristi had lunch together, McDowell complimented Cristi on her family and her relationship with her husband.  In response, Cristi "said at one point in time it had got that bad where they were contemplating divorce."  McDowell did not say *when* Cristi and defendant contemplated divorce—whether it was shortly before Cristi's death or many years earlier.

Defendant claims that McDowell's testimony was irrelevant to rebut the defense claim that Cristi was happy at the time of her death because there was no showing *when* Cristi and defendant contemplated divorce. He also claims the testimony should have been excluded under section 352 because it was likely to mislead the jury to believe, without any evidentiary basis, that he and Cristi were contemplating divorce near the time of her death.

We find no abuse of discretion in the admission of the testimony. Not only did the defense claim that defendant and Cristi had a good marriage near the time of her death, it claimed they had a good marriage, and suggested there were never any serious problems during the marriage. McDowell's testimony was relevant to rebut this claim. (*People v. Scheid, supra,* 16 Cal.4th at p. 14 [court has broad discretion to determine whether evidence is relevant].)

Nor was the evidence likely to mislead the jury to believe that the parties were necessarily contemplating divorce near the time of Cristi's death. (§ 352.) In closing argument, the prosecutor told the jury: "I want to be clear about this conversation with Taffy McDowell. It's unclear what time period Taffy is suggesting to you that they were contemplating divorce. And it certainly might have been in the past before June 7th, 2007, but I'm submitting to you that information because it reflects that [it] isn't a perfect marriage. *It's not an ideal situation that the defense has attempted to make it out to be*." (Italics added.)

D. *The Rebuttal Testimony of Defendant's Former Friends and Fellow Police Officers*

Defendant next claims the court prejudicially erred in admitting bad character evidence against him, specifically, the rebuttal testimony of Idaho Police Detective Raymond Chopko that defendant was "probably the biggest con man [Detective Chopko had] ever met in [his] life," and the rebuttal testimony of former Los Angeles Police Department Lieutenant Jerald Winkle, who testified that defendant "was not honest."

Defendant concedes that when he testified in his own defense and denied his guilt, he placed his reputation for truth and honesty in issue. (*People v. Taylor* (1986) 180 Cal.App.3d 622, 631; § 780, subd. (e).) He argues, however, that "[t]here were two problems with the court's ruling allowing the . . . police officers to give their opinion regarding [his] honesty. [¶] The first problem" with the officers' testimony is that their opinions were "based primarily upon prior incidents the court held were inadmissible." We find no merit to this claim.

Before trial, the court ruled that the prosecution would not be allowed to impeach defendant's testimony with reputation evidence in the form of "specific bad acts." The proffered bad acts evidence included (1) defendant's statement to Winkle, around 15 years before trial, that defendant was receiving a disability retirement pension from the San Bernardino County Sheriff's Department based on his claim that a carjacker shot him, when in fact he shot himself in his leg; and (2) an incident in Idaho, witnessed by Detective Chopko, in which defendant threw a bag of kittens into a river and drowned

them. At the time, defendant allegedly told Detective Chopko that "'the wife's cat had kittens again and I am not going to have cats around.'"

Defendant argues the admission of Detective Chopko's and Winkle's opinion testimony that he was a "con man" and "dishonest" "effectively prevented defense counsel from cross-examining either witness about the basis for his opinion and the opinions were therefore allowed to stand unchallenged. Inasmuch as the prior incidents [involving him drowning the kittens and shooting himself to obtain a disability retirement pension] were too unreliable or irrelevant to be admitted, allowing the opinions based upon these incidents without cross-examination rendered the trial fundamentally unfair."

This argument is utterly without merit. First, defendant cites no factual support for his claim that the officers' opinions that he was a "con man" and "dishonest" were based on his act of drowning the bag of kittens, in the case of Detective Chopko, or falsifying his retirement disability claim, in the case of Winkle. Moreover, defendant cites no authority to support his claim that the opinion testimony should have been excluded, and its admission violated his due process rights, because the opinion testimony was, or may have been, based on otherwise inadmissible "bad acts" evidence.

Defendant next argues that "[t]he other, and more important, problem" is that Detective Chopko's "con man" statement was highly inflammatory and should have been excluded under section 352. (*People v. Padilla* (1995) 11 Cal.4th 891, 925 ["undue prejudice" refers to evidence which tends to evoke an emotional bias].) We disagree that Detective Chopko's "con man" statement was unduly prejudicial.

39

Defendant concedes that Winkle "testified unemotionally, and properly, that he believed [defendant] was 'not honest,'" and there was "likely minimal harm" from Winkle's statement. Likewise, Detective Chopko's characterization of defendant as "the biggest con man" he had ever met was hardly any different than saying that defendant was "the most dishonest person" he had ever met.

In any event, it is unlikely that the jury was emotionally biased against defendant because Detective Chopko described him as "the biggest con man he had ever met." The jury heard that, years earlier, defendant was convicted in Idaho of misusing public funds while serving as the chief of police of Emmet, Idaho. The jury likely understood that Detective Chopko's opinion testimony was based on that incident. Indeed, defendant concedes that "[Detective] Chopko's opinion . . . was premised largely on the prior theft conviction about which the jury already knew." Given these circumstances, Detective Chopko's reference to defendant as a "con man" is unlikely to have inflamed the jury against defendant.

E. *No Cumulative Error*

It is unnecessary to address defendant's final claim that the cumulative effect of the trial court's evidentiary errors requires reversal, given our conclusion that all of the challenged evidence was properly admitted and there was therefore no individual evidentiary error. (*People v. Richardson* (2008) 43 Cal.4th 959, 1036 ["'If none of the claimed errors were individual errors, they cannot constitute cumulative errors . . . .'"].)

40

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING _____

J.

We concur:

RAMIREZ _____

P. J.

MILLER _____

J.